UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
KATY CORRIGAN,

                Plaintiff,

        - against -

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

                Defendant.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
18-CV-5686 (PKC)

PAMELA K. CHEN, United States District Judge:

Plaintiff Katy Corrigan brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the decision made by the Commissioner of the Social Security Administration ("SSA") denying Plaintiff's claim for Supplemental Security Income ("SSI") under Title II of the Social Security Act. Before the Court is Plaintiff's motion for judgment on the pleadings, and the Commissioner's cross-motion for judgment on the pleadings. Plaintiff seeks reversal of the Commissioner's decision, or alternatively, remand for further administrative proceedings. The Commissioner seeks affirmation of the decision to deny benefits. For the reasons that follow, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion. This case is remanded for further proceedings consistent with this Memorandum & Order.

## BACKGROUND

### I. Procedural History

On August 24, 2013, Plaintiff filed an application for SSI, arguing that she was disabled as of September 1, 2012. (Administrative Transcript ("Tr."), Dkt. 10, at 28.) Her application was denied on December 9, 2013 (*id.* at 121–32), and she requested a hearing before an administrative

law judge ("ALJ") on January 9, 2014 (*id.* at 133). Plaintiff appeared with a non-attorney representative at a hearing before ALJ Laura Michalec Olszewski on January 25, 2016. (*Id.* at 58–108.) By decision dated May 2, 2016, the ALJ found that Plaintiff was not disabled. (*Id.* at 25–37.) The ALJ's decision became the Commissioner's final decision on July 10, 2017, when the Appeals Council denied review of the decision. (*Id.* at 18–24.) This appeal followed.[1] (*See generally* Complaint ("Compl."), Dkt. 1.)

## II. The ALJ Decision

In evaluating disability claims, the ALJ must adhere to a five-step inquiry. The plaintiff bears the burden of proof in the first four steps of the inquiry; the Commissioner bears the burden in the final step. *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). First, the ALJ determines whether the plaintiff is currently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If the answer is yes, the plaintiff is not disabled. If the answer is no, the ALJ proceeds to the second step to determine whether the plaintiff suffers from a severe impairment.

---

[1] According to Title 42, United States Code, Section 405(g),

> [a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Commissioner of Social Security may allow.

42 U.S.C. § 405(g). "Under the applicable regulations, the mailing of the final decision is presumed received five days after it is dated unless the [plaintiff] makes a reasonable showing to the contrary." *Kesoglides v. Comm'r of Soc. Sec.*, No. 13-CV-4724 (PKC), 2015 WL 1439862, at *3 (E.D.N.Y. Mar. 27, 2015) (citing 20 C.F.R. §§ 404.981, 422.210(c)).

Counsel for Plaintiff twice requested additional time to file this appeal and the Commissioner granted both requests. (Tr. at 1–2.) On September 26, 2018, the Commissioner granted Plaintiff an additional thirty days to file a civil action (*id.*), and this appeal was filed on October 11, 2018 (*see generally* Compl., Dkt. 1). Therefore, the Court determines that this appeal was timely filed.

20 C.F.R. § 404.1520(a)(4)(ii). An impairment is severe when it "significantly limits [the plaintiff's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the impairment is not severe, then the plaintiff is not disabled. In this case, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 24, 2013, the application date. (Tr. at 30.) The ALJ further found that Plaintiff suffered from the following severe impairments: major depressive disorder and generalized anxiety disorder, "[e]ach one . . . impos[ing] more than a slight limitation on her ability to perform basic work activities . . . [but] . . . not preclud[ing] *all work activities*." (*Id.*) Moreover, the ALJ held that Plaintiff's history of substance abuse, and her obesity and venous insufficiency, were not severe impairments. (*Id.*)

Having determined that Plaintiff satisfied her burden at the first two steps, at least with respect to her psychiatric disabilities, the ALJ progressed to the third step and determined that none of Plaintiff's impairments met or medically equaled the severity of any of the impairments in the Listings, including 12.04, 12.06, 12.09. (*Id.* at 31–32 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1).) Moving to the fourth step, the ALJ found that Plaintiff maintained residual functional capacity ("RFC")[2] to perform

> a full range of work at all exertional levels but with the following nonexertional limitations: the [plaintiff] should work in a low stress environment defined as occasional judgment, occasional decision-making and occasional changes in the work setting. The [plaintiff] should be limited to simple, routine, and repetitive tasks. The [plaintiff] should have occasional interaction with supervisors, coworkers, and the public.

(*Id.* at 33.) At step four, the ALJ determined that Plaintiff had no past relevant work. (*Id.* at 35.) The ALJ then proceeded to step five to determine whether Plaintiff—given her RFC, age,

---

[2] To determine the plaintiff's RFC, the ALJ must consider the plaintiff's "impairment(s), and any related symptoms . . . [which] may cause physical and mental limitations that affect what [the plaintiff] can do in the work setting." 20 C.F.R. § 404.1545(a)(1).

3

education, and work experience—had the capacity to perform other substantial gainful work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). In this case, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff was capable of performing. (Tr. at 35–36.)

## STANDARD OF REVIEW

Unsuccessful claimants for disability benefits under the Social Security Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits. 42 U.S.C. § 405(g). In reviewing a final decision of the Commissioner, the Court's role is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera*, 697 F.3d at 151 (internal quotation marks omitted). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks and alterations omitted). In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotation marks omitted). However, the Court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012). If there is substantial evidence in the record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld. 42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013).

**DISCUSSION**

Plaintiff argues that the ALJ did not properly weigh the medical opinion evidence regarding Plaintiff's mental impairments by affording "limited weight" to the opinion of Plaintiff's treating psychiatrist and affording "limited weight" to the Commissioner's own examining psychologist. (Plaintiff's Brief ("Pl.'s Br."), Dkt. 12, at 10–15.) The Court agrees and concludes that remand on this basis is warranted.[3]

**I.   The Treating Physician: Dr. Giovanny Nuñez**

Plaintiff argues that the ALJ erred by affording "limited weight" to the opinion of her treating psychiatrist—Dr. Giovanny Nuñez—in violation of the treating physician rule. The Court agrees.

The information in the record with respect to Dr. Nuñez is as follows. On September 11, 2013, Dr. Nuñez submitted a "treating physician's wellness plan report" to the Human Resources Administration ("HRA") indicating that Plaintiff suffered from Major Depression and had an "anxious and depressed mood." (Tr. at 322–23.) Dr. Nuñez noted that, at the time, Plaintiff was prescribed Clonazepam, Prozac, Wellbutrin, and one additional medication.[4] (*Id.*) Dr. Nuñez wrote that Plaintiff's condition had not been resolved or stabilized as "she continue[d] to have acute symptoms" and "need[ed] ongoing treatment," and further indicated that Plaintiff was unable to work for at least twelve months. (*Id.* at 323.) Plaintiff has also submitted into the record over

---

[3] Plaintiff also asserts that the ALJ failed to properly evaluate her testimony. (Pl.'s Br., Dkt. 12, at 15–18.) As remand is warranted on other grounds, the Court does not reach that question. Additionally, the Court notes that Plaintiff does not appeal the ALJ's determination that she was disabled based on her alleged physical disabilities (*see generally id.*), and so it does not review that portion of the ALJ's decision.

[4] The Court notes that Dr. Nuñez listed the additional medication, as well as additional clinical findings, but his handwriting is indecipherable. (*See id.*)

5

500 pages of psychiatric records spanning from January 16, 2013 to November 16, 2015, including psychiatric evaluations by Dr. Nuñez and psychotherapy notes from a licensed social worker, Kim Thiessen, L.M.S.W.[5] (*See id.* at 396–943.) These extensive records include many instances of depressed mood, anxiety, sleep disturbances, and abnormal mental status examinations.[6]

Additionally, on September 26, 2015, Dr. Nuñez completed a mental impairment questionnaire on behalf of Plaintiff. (*Id.* at 368–72.) He noted Plaintiff's diagnoses of major

---

[5] Although not argued by Plaintiff on appeal, the Court notes that the ALJ failed to solicit any information from Plaintiff's treating therapist, Kim Thiessen, L.M.S.W. To the extent that, on remand, the ALJ finds Plaintiff's medical evidence contradictory or insufficient, the ALJ should solicit Ms. Thiessen's medical opinion in order to complete the record.

[6] (*See, e.g.*, Tr. at 660 (Plaintiff describing, on January 28, 2013, increasing depression and recurrent nightmares); *id.* at 664 (Plaintiff found to be depressed with tearfulness and feeling overwhelmed with low self-esteem on February 11, 2013); *id.* at 529–33 (Plaintiff describing, on March 20, 2013, symptoms of feeling tired, but difficulty sleeping at night, and dysphoria; a mental status exam revealed a dysphoric mood and affect, and Dr. Nuñez prescribed Fluoxetine and Diphenhydramine); *id.* at 671–73 (March 25, 2013 mental status exam showing low self-esteem, self-defeating thoughts, somewhat pressured speech, and poor sleep); *id.* at 709–11 (on July 19, 2013, Plaintiff described passive thoughts of death, isolation, and poor sleep due to anxiety); *id.* at 724 (Plaintiff reported, on September 30, 2013, feeling fatigued, anxious, and depressed); *id.* at 728–29 (Plaintiff reported, on October 15, 2013, significant sleep disturbances, and a mental status exam showed slowed motor activity); *id.* at 729, 731, 735–42 (Plaintiff describing additional sleep disturbances with mental status examination changes during October and November 2013); *id.* at 750 (Plaintiff reported, on December 27, 2013, problems sleeping and presented with constricted affect); *id.* at 758–59 (Plaintiff appeared "very anxious" with "pressured speech"); *id.* at 762–65 (February 19, 2014 visit where Plaintiff presented as confused and lethargic and continued to have anxiety; mental status exam showed a labile and depressed mood and affect, lethargic motor activity, and poor sleep); *id.* at 770–71 (Plaintiff reported, on April 4, 2014, fatigue and presented with pressured speech and non-linear thinking); *id.* at 781–84 (on April 28, 2014, Plaintiff continued to experience fatigue and anxiety, and a mental status exam showed an agitated and tearful mood/affect, feelings of hopelessness and helplessness, and pressured speech); *id.* at 785–90 (Plaintiff remained anxious, irritable, and fatigued during May 2014 therapy sessions); *id.* at 793–804 (Plaintiff continued to present with a depressed mood and feelings of hopelessness during June 2014); *id.* at 857 (Plaintiff complained of anxiety and sleep problems on November 10, 2014); *id.* at 861–62 (Plaintiff exhibited pressured speech on December 1, 2014); *id.* at 865–66 (December 15, 2014 mental status exam showed fatigued mood/affect and poor sleep); *id.* at 894–912 (finding same at April, May, and June 2015 therapy sessions); *id.* at 917 (August 3, 2015 mental status exam noted Plaintiff's disheveled appearance and labile mood/affect).)

depression disorder and panic disorder, that she was prescribed four different psychiatric medications, and noted that the following signs and symptoms supported Plaintiff's diagnoses and assessment: depressed mood; persistent or generalized anxiety; feelings of guilt or worthlessness; easy distractibility; anhedonia/pervasive loss of interests; decreased energy; social withdrawal or isolation; and insomnia. (*Id.* at 368–69.) Dr. Nuñez responded "yes" to the question whether Plaintiff "experience[d] episodes of decompensation or deterioration in a work or work-like setting which cause[d] [her] to withdraw from the situation and/or experience an exacerbation of symptoms." (*Id.* at 370.) He also listed moderate-to-marked limitation[7] in the following areas: remembering locations and work-like procedures; understanding and remembering one-to-two step instructions; understanding and remembering detailed instructions; carrying out simple, one-to-two step instructions; carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule and consistently being punctual; sustaining ordinary routine without supervision; working in coordination with or near others without being distracted by them; making simple work-related decisions; completing a workday without interruptions from psychological symptoms; performing at a consistent pace without rest periods of unreasonable length or frequency; interacting appropriately with the public; asking simple questions or requesting assistance; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them; maintaining socially appropriate behavior; adhering to basic standards of neatness; responding appropriately to workplace changes; being aware of hazards and taking appropriate precautions; traveling to unfamiliar places or using public transportation; setting realistic goals; and making

---

[7] "Moderate-to-marked limitation" was defined in the mental impairment questionnaire as "symptoms frequently interfer[ing] with [that] ability (Frequent - 1/3 - 2/3 of an 8-[hour] workday)." (*Id.* at 371.)

plans independently. (*Id.* at 371.) Finally, Dr. Nuñez opined that Plaintiff was likely to be absent from work as a result of her impairments at least two to three times per month and that her onset of symptoms dated back to June 1, 2010. (*Id.* at 372.)

Plaintiff reported to the emergency room on June 3, 2017, for an anxiety attack, at which time she was provided Ativan. (*Id.* at 55–57.) Plaintiff also submitted into evidence a June 9, 2017 functional assessment form completed by Dr. Nuñez and provided to the HRA. (*Id.* at 50.) Dr. Nuñez outlined[8] that Plaintiff's current diagnoses were panic disorder and major depressive disorder and noted that Plaintiff was "unable to work for at least 12 months ([and] may be eligible for long-term disability [benefits])." (*Id.*)

The ALJ afforded "limited weight" to Dr. Nuñez's medical opinion, reasoning, in part, that "the finding of disability is reserved to the Commissioner" and that Plaintiff's "essentially normal mental status examination findings, [her] general independence with activities of daily living, and [her] ability to care for her daughter all suggest [Plaintiff] can perform work at the RFC." (*Id.* at 34.) The ALJ also relied on a progress note completed by Dr. Rachel Goldman, Ph.D. (*Id.*) On May 29, 2015, Dr. Goldman consulted with Dr. Nuñez regarding Plaintiff's readiness for bariatric surgery. (*Id.* at 1078.) In her progress note for that date, Dr. Goldman wrote that Dr. Nuñez had described Plaintiff's Major Depressive Disorder as "in remission" and that Dr. Goldman had "no concerns with [Plaintiff] proceeding with surgery at this time . . . [Plaintiff] has been 'stable for many years.'" (*Id.*) Dr. Goldman also noted Plaintiff's panic disorder and ADHD. (*Id.*)

The Court concludes that the ALJ's decision to assign "little weight" to Dr. Nuñez's medical opinion is not supported by substantial evidence. "With respect to the nature and severity

---

[8] The Court notes that, while Dr. Nuñez listed "relevant clinical findings," his handwriting is indecipherable. (*See* Tr. at 50.)

of a [plaintiff]'s impairments, the SSA recognizes a treating physician rule of deference to the views of the physician who has engaged in the primary treatment of the [plaintiff]."[9] *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks, alterations, and citations omitted). As the Second Circuit has explained:

> An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various factors to determine how much weight to give to the opinion. Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the [SSA's] attention that tend to support or contradict the opinion. The regulations also specify that the Commissioner will always give good reasons in her notice of determination or decision for the weight she gives [Plaintiff's] treating source's opinion.

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (internal quotation marks and citations omitted).

Here, in discounting the medical opinion of Plaintiff's treating psychiatrist, Dr. Nuñez, the ALJ failed to discuss or elaborate on several of the relevant factors, including "(i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; . . . [and] (iv) whether the opinion is from a specialist," *see id.*, despite the fact that the ALJ had over two years of medical records from Dr. Nuñez. Furthermore, to the extent the ALJ believed that these records were insufficient for her to engage in a full analysis of the relevant factors, she should have taken affirmative steps to develop a sufficient evidentiary record, including consulting with Dr. Nuñez to obtain more information and

---

[9] Although "[t]he current version of the [Social Security Act's] regulations eliminates the treating physician rule," the rule nevertheless applies to Plaintiff's claim, which was initially filed on April 24, 2013, as the current regulations only "apply to cases filed on or after March 27, 2017." *Burkard v. Comm'r of Soc. Sec.*, No. 17-CV-290 (EAW), 2018 WL 3630120, at *3 n.2 (W.D.N.Y. July 31, 2018); *see also* 20 C.F.R. § 404.1520c.

9

resolve, if possible, any seeming inconsistencies or deficiencies in his treatment records, or as between his records or opinions and those of other medical professionals, such as Dr. Goldman. As courts in this Circuit have held, "the ALJ must make every reasonable effort to help an applicant get medical reports from [her] medical sources" and "must seek additional evidence or clarification when the report from the [plaintiff]'s medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques." *Calzada v. Astrue*, 753 F. Supp. 2d 250, 269 (S.D.N.Y. 2010) (internal quotation marks and alterations omitted); *see also* 20 C.F.R. § 416.927(d)(2).

Similarly, the ALJ's reliance on Dr. Goldman's May 2015 progress note to undermine Dr. Nuñez's opinions, which were based on over two years of treating Plaintiff, is not supported by substantial evidence and is contrary to applicable legal standards. First, Dr. Goldman's progress note in May 2015 is a single data point for a period of alleged disability spanning more than three years beginning in September 2012. Second, Dr. Goldman's progress note, on its face, was limited and specific to Plaintiff's psychiatric ability to undergo significant and potentially life-altering surgery in May 2015 and did not purport to address Plaintiff's ability to work, in particular, her ability to cope with the psychological or mental demands of work. Third, to the extent that Dr. Goldman's report that, according to Dr. Nuñez, Plaintiff's Major Depressive Disorder was "in remission" as of May 2015 and that she had been "stable for many years," was at odds with both the voluminous treatment records and notes of both Dr. Nuñez and Ms. Thiesen, which span from January 16, 2013, to November 16, 2015 (*see* Tr. at 396–943), the ALJ was obligated to seek clarification and additional information prior to dismissing both Dr. Nuñez's and Ms. Theisen's opinions. As discussed earlier, "the ALJ must make every reasonable effort to help an applicant

10

get medical reports from [her] medical sources" and "must seek additional evidence or clarification when the report from the [plaintiff]'s medical source . . . does not contain all the necessary information[.]" *Calzada*, 753 F. Supp. 2d at 269 (internal quotation marks and alterations omitted). "This rule applies even where the plaintiff was represented by counsel at the hearing." *Vazquez v. Comm'r of Soc. Sec.*, No. 14-CV-6900 (JCF), 2015 WL 4562978, at *17 (S.D.N.Y. July 21, 2015) (citing *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999)). This is especially vital when developing the record with respect to a treating physician's opinion "[b]ecause of the considerable weight ordinarily accorded to the opinions of treating physicians." *Rocchio v. Astrue*, No. 08-CV-3796 (JSR) (FM), 2010 WL 5563842, at *11 (S.D.N.Y. Nov. 19, 2010), *report and recommendation adopted*, No. 08-CV-3796 (JSR), 2011 WL 1197752 (S.D.N.Y. Mar. 28, 2011). Therefore, while a "treating physician's statement that the [plaintiff] is disabled cannot itself be determinative[,] . . . failure to develop conflicting medical evidence from a treating physician is legal error requiring remand." *Id.* (internal quotation marks omitted and alterations in the original); *see also Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).

Finally, it is not within the ALJ's purview to determine that Plaintiff's activities of daily living somehow negated the evaluation of Plaintiff's treating psychiatrist with respect to Plaintiff's psychiatric impairments. *See Indelicato v. Colvin*, No. 13-CV-4553 (JG), 2014 WL 674395, at *3 (E.D.N.Y. Feb. 21, 2014) (noting that "an ALJ is not a doctor, and therefore is not equipped to make medical judgments"); *Beckers v. Colvin*, 38 F. Supp. 3d 362, 374–75 (W.D.N.Y. 2014) ("It is not proper for the ALJ to simply pick and choose from the transcript only such evidence that supports his determination. Nor is it appropriate for an ALJ to substitute his own opinion for the findings of medical sources on the record." (internal quotation marks and citations omitted)). Moreover, an assessment of a plaintiff's activities of daily living ("ADLs") "without any

11

explanation as to how those ADLs qualify Plaintiff for employment, does not adhere to the Commissioner's regulations that recognize that individuals with psychiatric disabilities may appear to adequately function in a restricted setting, but still may be unable to meet the demands of a competitive workplace environment." *McColl v. Saul*, 18-CV-4376 (PKC), 2019 WL 4727449, at *11 (E.D.N.Y. Sept. 27, 2019) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 (C)(3) ("[The Commissioner] must exercise great care in reaching conclusions about [the Plaintiff's] ability or inability to complete tasks under the stresses of employment during a normal workday or work week based on a time-limited mental status examination or psychological testing by a clinician, or based on [the plaintiff's] ability to complete tasks in other settings that are less demanding, highly structured or more supportive.")); SSR 85–15, 1985 WL 56857, at *6 (Jan. 1, 1985) ("[T]he reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day. . . . Thus, the mentally ill may have difficulty meeting the requirements of so-called 'low-stress' jobs."); *Moss v. Colvin*, No. 13-CV-00731 (GHW) (MHD), 2014 WL 4631884, at *33 (S.D.N.Y. Sept. 16, 2014) ("There are critical differences between activities of daily living (which one can do at his own pace when he is able) and keeping a full time job.").

For these reasons, the Court finds that remand is necessary.

**II.     The Consultative Examiner:  Dr. Ashley Knoll, Psy.D.**

The ALJ also discounted the October 2013 medical report submitted by Dr. Ashley Knoll, Psy.D., the Commissioner's consultative examiner. (Tr. at 34.) In her report, Dr. Knoll

summarized Plaintiff's psychiatric history and then provided an overview of her current functioning. (*Id.* at 324–25.) Dr. Knoll explained:

> [Plaintiff] reported that she will wake up approximately five times a night. She reported having a normal appetite, but stated that she has gained approximately 70 pounds. [Plaintiff] reported experiencing depressed moods a few times a week. She also reported experiencing crying spells, a loss of usual interests, irritability, social withdrawal, diminished sense of pleasure, concentration difficulties, and fatigue. [Plaintiff] denied any current suicidal ideation. She reported she experienced suicidal ideation approximately four years ago. She denied a plan or intent at that time. [Plaintiff] denied any current or history of homicidal ideation. [Plaintiff] reported the following anxiety-related symptomatology: Excessive apprehension/worry, feeling easily fatigued, irritability, restless, and having problems concentrating. [Plaintiff] was unsure if she had had panic attacks in the past, but stated that she feels more anxious when on the train, in heat, and when traveling in general. [Plaintiff] denied any manic symptomatology. She denied any symptoms of a thought disorder. [Plaintiff] reported having short-term memory deficits and concentration difficulties.

(*Id.* at 325.) With respect to Plaintiff's mental status examination, Dr. Knoll found her demeanor "cooperative," but that "her manner of relating was poor. She often had to be redirected and was emotionally distressed during the evaluation, particularly she was tearful and shaking." (*Id.* at 326.) In the "appearance" portion of the mental status examination, Dr. Knoll noted that Plaintiff's "posture was slouched" and that "[h]er motor behavior was shaking and trembling." (*Id.*) Her speech was "[f]luent, yet monotonous," and her affect was "[a]nxious and depressed." (*Id.*) Plaintiff's mood was "[d]ysthymic," and her "attention and concentration" were "impaired"; her "recent and remote memory skills" were also "[i]mpaired due to her psychiatric symptomatology and a history of drug abuse and dependency." (*Id.*)

Dr. Knoll described Plaintiff's "mode of living" as follows:

> [Plaintiff] reported she is able to dress, bathe, and groom herself; however, at times she loses the motivation to do so. She reported that she will not go days without it, but that there will be days where she does not perform this task. [Plaintiff] stated she is able to cook and prepare her own food. She reported she does her own general cleaning, stating her house is very clean, noting that it is "immaculate." [Plaintiff] reported she does her own laundry. [Plaintiff] stated she does her own

13

shopping. [Plaintiff] reported that she has difficulty managing her own money, stating that she spends it carelessly. [Plaintiff] is unable to drive, but she is able to take public transportation on her own. [Plaintiff] reported that she has friends who will contact her via telephone; however, she will often ignore their calls and stated that she will go a month at a time without checking her voicemail. She stated that she tends to isolate herself from others . . . [Plaintiff] reported her interests include animals. She stated she spends her day cleaning, spending time with her daughter, and taking care of other tasks as needed.

(*Id.* at 327.)

In her "medical source statement," Dr. Knoll wrote:

[Plaintiff] is able to follow and understand simple directions. She has mild limitations in performing simple tasks independently. She has moderate limitations maintaining attention and concentration. She is able to maintain a regular schedule. She is able to learn new tasks. She has marked limitations performing complex tasks independently. She has moderate limitations making appropriate decisions. She has marked limitations relating adequately with others. She has marked limitations appropriately dealing with stress. Her difficulties are caused by her psychiatric symptomatology.

(*Id.* at 327–28.) Dr. Knoll further noted diagnoses of major depressive disorder, generalized anxiety disorder, and opioid dependency, and suggested that it is necessary to rule out obsessive compulsive disorder. (*Id.* at 328.) Finally, Dr. Knoll noted that Plaintiff's prognosis was "fair given that her symptoms are chronic and severe" and that she "will not be able to manage her own funds due to opioid dependency and reported difficulties managing money." (*Id.*)

The ALJ afforded "great weight" to the portions of Dr. Knoll's opinion that found Plaintiff had mild limitations, but "limited weight" to those portions finding that Plaintiff had "marked limitations relating adequately with others," "appropriately dealing with stress," and "performing complex tasks independently"—opinions that, notably, were consistent with Dr. Nuñez's and Ms. Thiesen's findings. (*Id.* at 34.) The ALJ reasoned that Plaintiff's "independence with activities of daily living, [her] ability to care for her daughter, and [her] treatment notes showing essentially

normal mental status examination findings all suggest [Plaintiff] has greater functional abilities than those noted by Dr. Knoll in this portion of her opinion." (*Id.*)

For many of the same reasons previously discussed, the ALJ erred by discounting Dr. Knoll's opinion regarding Plaintiff's mental impairments on the basis that the opinion was inconsistent with Plaintiff's ability to perform certain ADLs. Moreover, the ALJ improperly "cherry-picked" the portions of Dr. Knoll's medical report that she found supported the RFC determination, while discounting the vast majority of Dr. Knoll's medical opinion.

> Federal courts reviewing administrative social security decisions decry "cherry picking" of [relevant] evidence, which may be defined as inappropriately crediting evidence that supports administrative conclusions while disregarding differing evidence from the same source. "Cherry picking" can indicate a serious misreading of evidence, failure to comply with the requirement that all evidence be taken into account, or both. . . . It is entirely proper for the ALJ to only credit portions of medical source opinions, or weigh different parts of the same opinion differently. However, when the ALJ uses a portion of a given opinion to support a finding, while rejecting another portion of that opinion, the ALJ must have a sound reason for the discrepancy.

*Artinian v. Berryhill*, No. 16-CV-4404 (ADS), 2018 WL 401186, at *8 (E.D.N.Y. Jan. 12, 2018) (internal quotation marks and citations omitted); *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *Smith v. Bowen*, 687 F. Supp. 902, 904 (S.D.N.Y. 1988) ("Although the ALJ is not required to reconcile every ambiguity and inconsistency of medical testimony, [she] cannot pick and choose evidence that supports a particular conclusion." (internal citations omitted)).

Thus, the Court finds that the diminished weight the ALJ afforded to particular portions of Dr. Knoll's consultative medical report, which found marked limitations in Plaintiff's psychological and mental processing abilities, is not supported by substantial evidence, and that remand is warranted on that basis.

## CONCLUSION

For the reasons set forth above, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion. The Commissioner's decision is remanded for further consideration consistent with this Memorandum & Order. The Clerk of Court is respectfully requested to enter judgment and close this case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: October 16, 2019
　　　　Brooklyn, New York